**ORAL ARGUMENT NOT YET SCHEDULED**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————————————

**No. 13 – 5335**

————————————

**Cause of Action,**
*Plaintiff-Appellant*,

v.

**Federal Trade Commission,**
*Defendant-Appellee.*

————————————

On Appeal from the United States District Court for the District of Columbia
Civil Action No. 12-cv-00850 (Hon. Emmet G. Sullivan)

————————————

**Corrected Opening Brief of Plaintiff-Appellant Cause of Action**

————————————

PATRICK J. MASSARI
ALLAN L. BLUTSTEIN
R. JAMES VALVO III
MARIE ALLISON CONNELLY
CAUSE OF ACTION
1919 Pennsylvania Ave., NW, Suite 650
Washington, D.C. 20006
(202) 499-4232

May 6, 2014                           *Counsel for Cause of Action*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Appellant states as follows:

### A.     Parties and Amici

Cause of Action was the Plaintiff below and is the Appellant.  The Federal Trade Commission was the Defendant below and is the Appellee.

There were no amici in the district court.  Reporters Committee for Freedom of the Press, *et al*., intend to participate as amici supporting Appellant.

There are no intervenors.

### B.     Ruling Under Review

The ruling under review is *Cause of Action v. Federal Trade Commission*, 12-cv-00850-EGS (D.D.C. Aug. 19, 2013) (ECF No. 20), made appealable by the final consent judgment issued September 11, 2013 (ECF No. 26).  The decision is in the Appendix at A374, and is published as *Cause of Action v. Federal Trade Commission*, 961 F. Supp. 2d 142 (D.D.C. 2013).

### C.     Related Case

This case has never been before this Court.  There are no other related cases pending.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Appellant Cause of Action is a nonprofit corporation. It has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........... ii

RULE 26.1 CORPORATE DISCLOSURE STATEMENT................................. iii

TABLE OF CONTENTS................................................................ iv

TABLE OF AUTHORITIES ........................................................ vi

GLOSSARY.............................................................................. xi

JURISDICTIONAL STATEMENT ..................................................... 1

STATEMENT OF THE ISSUES...................................................... 2

STATUTES AND REGULATIONS .................................................. 3

STATEMENT OF THE CASE ......................................................... 3

I.    A Case Of First Impression: "Representative Of The News Media" Status
      After The OPEN Government Act of 2007....................................... 3

II.   Prelude To Avoidable Litigation: FTC Targets Cause Of Action. .................. 5

III.  FTC's Tripartite Denial: COA's FOIA Fee Waivers And Requests For News
      Media Requestor Status................................................................ 7

      A.    FOIA Request One (FOIA-2011-01431): August 30, 2011. ............... 7

      B.    FOIA Request Two (FOIA-2012-00227): October 28, 2011. ........... 10

      C.    FOIA Request Three (FOIA-2012-00687): January 27, 2012........... 10

SUMMARY OF THE ARGUMENT ................................................ 12

STANDARD OF REVIEW .......................................................... 14

ARGUMENT ........................................................................... 15

I.    COA Is A "Representative Of The News Media."........................... 15

      A.    FTC's Denial Of COA's Requests Was Erroneous And FTC's
            Regulation Was *Ultra Vires*. ............................................. 17

      B.    COA Meets The Statutory Test............................................. 18

            1.  Neither FTC nor the district court interpreted or applied the term
                "alternative media," therefore it is appropriate that this Court do
                so. ....................................................................... 21

            2.  The legislative history of the OPEN Government Act demonstrates
                Congress intended organizations like COA to be representatives of
                the news media. ...................................................... 22

      C.    Grounds For Reversing The District Court........................... 23

1.  The district court erroneously ignored the OPEN Government Act. ..................................................................23

2.  The district court erroneously held that COA did not possess "editorial skills to turn raw materials into a distinct work." ..........23

3.  The district court erroneously discounted COA's publication history and demanded unreasonable specificity as to future publications. ...................................................................27

4.  The district court erroneously held COA did not have the intent and capacity to distribute information. ...........................................30

II.  Weaponized FOIA Fee Waivers: FTC Wages War Against Nonprofits Critical Of FTC In The Age Of New Media ..................................................38

A.  FTC Denied Cause Of Action Fee Waivers Because The Agency Knew Cause Of Action Intended To Publish Articles Critical Of FTC. ........................................................................38

B.  FTC's Fee Waiver Denials Chill Free Speech For Nonprofits And Acts As An Impediment To Agency Oversight. ................................41

III.  The District Court Erred In Finding That Fee Issues Were Moot For Cause Of Action's January 27, 2012 FOIA Request. ................................................43

A.  FTC Cannot Refuse To Process A Request Merely Because It Is Substantially Identical To An Earlier Request.....................................45

B.  The Number Of Pages Implicated By COA's January 27, 2012 Request Is Sufficient To Trigger An Analysis Of Cause Of Action's Fee Requests....................................................................................47

C.  The District Court Erred In Not Finding That FTC Failed To Meet Its Burden To Conduct An Adequate Search For Records Pursuant To Cause Of Action's January 27, 2012 FOIA Request. ........................48

IV.  COA Qualified For A Public Interest Fee Waiver For FOIA Requests One, Two, And Three................................................................................................52

A.  Overview Of The Public Interest Fee Waiver Analysis.....................52

B.  COA Satisfied The Third Element Of The Public Interest Test. ........52

CONCLUSION ...................................................................................................55

CERTIFICATE OF COMPLIANCE.................................................................57

CERTIFICATE OF SERVICE ..........................................................................58

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Am. Mining Cong. v. Envtl. Prot. Agency*, 824 F.2d 1177 (D.C. Cir. 1987)...........19

*Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902).........................18

*\*Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86
  (D.C. Cir. 1986) ........................................................................ 37, 41, 42, 53, 55

*Bowen v. Mich. Acad. of Family Physicians*,
  476 U.S. 667 (1986)............................................................................18

*\*Carney v. Dep't of Justice*, 19 F.3d 807
  (2d Cir. 1994)....................................................... 24, 29, 33, 35, 52, 55

*Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ..........................18

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)............................................................................19

*Ctr. for Auto Safety v. Nat'l Highway Traffic Admin.*, 452 F.3d 798
  (D.C. Cir. 2006) ............................................................................14

*\*Ctr. for Pub. Integrity v. Dep't of Health & Human Servs.*,
  2007 U.S. Dist. LEXIS 56172 (D.D.C. Aug. 3, 2007) ..................... 30, 32, 34, 35

*Dart v. United States*, 848 F.2d 217 (D.C. Cir. 1988)............................................18

*D.C. Technical Assistance Org. v. Dep't of Hous. & Urban Dev.*,
  85 F. Supp. 2d 46 (D.D.C. 2000)................................................... 53, 55

*Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
  489 U.S. 749 (1989)....................................................................... 16, 43

Authorities upon which Appellant Cause of Action chiefly relies are marked with
an asterisk.

*Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989)............................................15

*\*Elec. Privacy Info Ctr. v. Dep't of Def.*, 241 F. Supp. 2d 5
  (D.D.C. 2003) ...........................3, 4, 20, 23, 24, 25, 26, 28, 30, 31, 33, 36, 39, 51

*\*Fed. CURE v. Lappin*, 602 F. Supp. 2d 197 (D.D.C. 2009)............... 24, 25, 28, 36

*Hall v. Cent. Intelligence Agency*, 668 F. Supp. 2d 172 (D.D.C. 2009)........... 43, 44

*Hall v. Cent. Intelligence Agency*, No. 04-814, 2005 U.S. Dist. LEXIS 6638
  (D.D.C. Apr. 13, 2005) ......................................................................33

*Hall v. Cent. Intelligence Agency*, 437 F.3d 94 (D.C. Cir. 2006).................... 43, 48

*Inturralde v. Comptroller of Currency*, 315 F.3d 311 (D.C. Cir. 2003) ................49

*Judicial Watch, Inc. v. Dep't of Justice*, 122 F. Supp. 2d 13
  (D.D.C. 2000) ................................................................................ 31, 34

*\*Judicial Watch, Inc. v. Gen'l Servs. Admin.*, No. 98-2223, 2000 U.S. Dist. LEXIS
  22872 (D.D.C. Sept. 25, 2000) ............................................... 52, 53, 55

*Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309 (D.C. Cir. 2003)........ 15, 29, 34, 35

*Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108 (D.C. Cir. 2004) .............15

*Larson v. Cent. Intelligence Agency*, 843 F.2d 1481 (D.C. Cir. 1988) .................15

*Long v. Dep't of Justice*, 450 F. Supp. 2d 42 (D.D.C. 2006) .................................46

*\*Nat'l Sec. Archive v. Dep't of Def.*, 880 F.2d 1381
  (D.C. Cir. 1989) .................................................... 3, 16, 20, 24, 25, 31, 36, 39, 46

*Nat'l Sec. Counselors v. Cent. Intelligence Agency*, 931 F. Supp. 2d 77,
  (D.D.C. Mar. 20, 2013).......................................................................45

*Nat'l Treasury Emps. Union v. Griffin*, 811 F.2d 644
  (D.C. Cir. 1987) ................................................................................52

*Oglesby v. Dep't of Army*, 920 F.2d 57 (D.C. Cir. 1990)........................................1

*Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697
     (D.C. Cir. 2009) ..................................................................17

*Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429
     (D.C. Cir. 1992) ..................................................................14

*Pub. Citizen v. U.S. Dist. Ct.*, 486 F.3d 1342 (D.C. Cir. 2007)...............................14

*Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655
     (D.C. Cir. 1994) ..................................................................22

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ......................................................19

*Spannaus v. Dep't of Justice*, 824 F.2d 52 (D.C. Cir. 1987) ...................................45

*Tax Analysts v. Dep't of Justice*, 965 F.2d 1092 (D.C. Cir. 1992) .........................37

*Toensing v. Dep't of Justice*, 890 F. Supp. 2d 121 (D.D.C. 2012).........................46

*United Distrib. Cos. v. Fed. Energy Reg. Comm'n*,
     88 F.3d 1105 (D.C. Cir. 1996)...........................................19

*Weisberg v. Dep't of Justice*, 705 F.2d 1344 (D.C. Cir. 1983) ................. 14, 15, 48

## STATUTES

5 U.S.C. § 552(a) ..........................................................................3

5 U.S.C. § 552(a)(4)..........................................................................15

5 U.S.C. § 552(a)(4)(A)(ii) ........................................... 17, 20, 21, 23, 24, 27, 33, 39

5 U.S.C. § 552(a)(4)(A)(ii)(II)........................................................16

5 U.S.C. § 552(a)(4)(A)(iv)(II)........................................................44

5 U.S.C. § 552(a)(4)(B) ................................................... 1, 14, 15

28 U.S.C. § 1291 ..........................................................................1

28 U.S.C. § 1331 ..........................................................................................1

28 U.S.C. § 2201 ..........................................................................................1

Freedom of Information Reform Act of 1986, Pub. L. No. 99-570,
    100 Stat. 3207 (1986)..............................................................................3

OPEN Government Act of 2007, Pub. L. No. 110-175,
    121 Stat. 2524 (2007)...3, 4, 5, 7, 12, 16, 17, 22, 23, 28, 31, 32, 34, 37, 39, 41, 53

## REGULATIONS

16 C.F.R. § 4.8(b)(2) (2012) ....................................................... 17, 30, 36

16 C.F.R. § 4.8(b)(3) (2012) ............................................................. 47, 48

16 C.F.R. § 4.8(b)(4) (2012) ............................................................. 47, 48

16 C.F.R. § 4.8(b)(6) (2012) .....................................................................48

16 C.F.R. § 4.8(d)(3) (2012) ........................................................... 6, 7, 9

16 C.F.R. § 4.8(e)(2)(1)(c) (2012) ..........................................................53

16 C.F.R. §§ 255.0–255.5 (2009) .............................................................8

52 Fed. Reg. 10,012 (Mar. 27, 1987)........................... 16, 30, 32, 36, 37

73 Fed. Reg. 72,374 (Nov. 28, 2008)........................................................7

74 Fed. Reg. 53,124 (Oct. 15, 2009)........................................................7

79 Fed. Reg. 15,680 (Mar. 24, 2014)......................................................17

## ADDITIONAL AUTHORITY

Fed. R. Civ. P. 56 ................................................................................. 14

132 Cong. Rec. S14,298 (daily ed. Sept. 29-30, 1986) (Sen. Leahy)........... 3, 38, 40

ix

132 Cong. Rec. H9,464 (daily ed. Oct. 8, 1986) (Reps. English & Kindness) .......42

153 Cong. Rec. S10,986 (daily ed. Aug. 3, 2007)................................ 22, 28, 31, 37

S. Comm. on the Judiciary, S. Rep. No. 854, 93d Cong.,
   2d Sess. 11-12 (1974) ........................................................................42

Subcomm. Rep. on Admin. on Practice & Procedure of the S. Judiciary Comm.,
   95th Cong., 2d Sess. 90-96 (1980) ........................................................42

*Alternative*, Oxford Dictionaries, http://goo.gl/PYBvRv ......................................21

*Select*, Merriam-Webster.com, http://goo.gl/H98gtL  ............................................47

Matthew Vadum, *Obama Uses Taxpayers Cash to Back ACORN Name Changes
   Used to Dodge the Law*, Wash. Times, Nov. 28. 2011 ........................................26

Michael Russo, *Are Bloggers Representatives of the News Media Under the
   Freedom of Information Act?*, 40 Colum. J.L. & Soc. Probs. 225 (2006) ..........32

Publication history of COA's newsletter August - December 2011 .....................28

*The Federal FOIA Ombudsman*, Office of Gov't Info. Servs.,
   https://ogis.archives.gov/ ....................................................................45

# **GLOSSARY**

| | |
|---|---|
| COA | Cause of Action |
| FOIA | Freedom of Information Act |
| FTC | Federal Trade Commission |
| FIRA | Freedom of Information Reform Act of 1986 |
| OGIS | Office of Government Information Services |
| OMB | Office of Management and Budget |

## <u>JURISDICTIONAL STATEMENT</u>

Cause of Action properly exhausted its administrative remedies before filing suit in district court. *Oglesby v. Dep't of Army*, 920 F.2d 57, 61 (D.C. Cir. 1990). The district court had subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201, *et seq.* (declaratory judgment), and 5 U.S.C. § 552(a)(4)(B) (Freedom of Information Act). Judge Emmet G. Sullivan granted Appellee's motion for summary judgment. *Cause of Action v. Fed. Trade Comm'n*, 12-cv-00850-EGS (ECF No. 19 (Aug. 19, 2013 memorandum opinion), ECF No. 20 (Aug. 19, 2013 order), and ECF No. 26 (Sept. 12, 2013 final consent judgment and appealable order)). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Did the district court erroneously find that Cause of Action did not qualify for news media requestor status with respect to its Freedom of Information Act requests designated by FTC as FOIA-2011-01431 and FOIA-2012-00227?

2.      Did the district court erroneously find that Cause of Action's requests for news media requestor status and a public interest fee waiver were moot with respect to its Freedom of Information Act Request designated by FTC as FOIA-2012-00687 and dated January 27, 2012?

3.      Did the district court erroneously find that Cause of Action did not qualify for a public interest fee waiver with respect to its Freedom of Information Act Requests designated by FTC as FOIA-2011-01431 and FOIA-2012-00227?

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the Addendum.

## STATEMENT OF THE CASE

**I.     A Case Of First Impression: "Representative Of The News Media" Status After The OPEN Government Act Of 2007.**

In 1986, Congress enacted the Freedom of Information Reform Act of 1986 (FIRA), Pub. L. No. 99-570, §§ 1801-04, 100 Stat. 3207, 3207-08 (1986), providing that executive branch agencies should grant Freedom of Information Act (FOIA) fee waivers if the information sought is in the public interest or if the requestor is a representative of the news media. *Id.* § 1803 (amending ¶ (4)(A) of 5 U.S.C. § 552(a)).

In 1989, this Court decided *National Security Archive v. Dep't of Defense*, 880 F.2d 1381 (D.C. Cir. 1989). Guided by FIRA's legislative history, the Court broadly construed the term "representative of the news media" as "any person or organization which regularly publishes or disseminates information to the public." *Id.* at 1385-86 (citing 132 Cong. Rec. S14,298 (daily ed. Sept. 29-30, 1986)).

In 2003, the United States District Court for the District of Columbia decided that the Electronic Privacy Information Center (EPIC) qualified as a "representative of the news media." *Elec. Privacy Info. Ctr. v. Dep't of Def.*, 241 F. Supp. 2d 5, 6-15 (D.D.C. 2003) [hereinafter *EPIC*]. The court's decision in *EPIC* was based, in large part, on the fact that EPIC, an organization founded in

3

1994, published a periodic electronic newsletter.  *Id.* at 13-14.  The court in *EPIC*

adopted the reasoning in *National Security Archive,* as well as FIRA's legislative

history, in concluding EPIC indeed qualified as a representative of the news media:

> The fact that EPIC's newsletter is disseminated via the
> Internet to subscriber's e-mail addresses does not change
> [their status as a representative of the news media]. . . .
> More importantly, the regulation anticipates technological
> advancements, recognizing that "as traditional methods of
> news delivery evolve (e.g., electronic dissemination of
> newspapers through telecommunications services), such
> alternative media would be included in [the news media]
> category."

*Id.* at 14 (citing Department of Defense regulations).

On December 17, 2007, Congress enacted the "Openness Promotes

Effectiveness in our National Government Act of 2007" or the "OPEN

Government Act of 2007," Pub. L. No. 110-175, 121 Stat. 2524 (2007) (OPEN

Government Act).  The OPEN Government Act defined "representative of the

news media" to include "any person or entity delivering news to a segment of the

public via methods of electronic dissemination."  *Id.* § 3, Protection Of Fee Status

For News Media.  It mandated that agencies recognize "alternative media" were

entitled to news media fee status: "alternative media *shall* be considered to be

news-media entities."  *Id.* (emphasis supplied).

The District of Columbia Circuit has not had occasion to apply or clarify the

definition of "representative of the news media" to nonprofit entities that rely in

4

the main on alternative media since the OPEN Government Act was enacted in

2007.  Accordingly, this case presents issues of first impression.

## II.    Prelude To Avoidable Litigation: FTC Targets Cause Of Action.

This case presents a cautionary tale about the harm done when agencies use

fee waiver categorizations to chill the government accountability activities of

nascent nonprofit organizations in the age of new media, especially when those

nonprofits, like Cause of Action (COA) here, criticize agency actions.  A020;

A026; A181; A184.[1]  Though this case has many facets, it can be distilled into two

basic questions.  First, should the court below have applied a 1956 media standard

to a 2012 world to determine if a nonprofit is a representative of the news media,

and/or qualifies for a public interest fee waiver, under FOIA?  And, second, should

FTC have been allowed to use FOIA's news media status and/or fee waiver

provisions against COA because the agency knew COA would be critical of its

actions?

-----

[1] In its April 4, 2012 appeal to FTC regarding its January 27, 2012 FOIA request, COA expressly indicated its intent to use the information gleaned from its FOIA request as raw material for an article titled, "**How the FTC Denies Fee Waivers to Organizations That Seek Information About FTC Operations**."  A181 (emphasis in bold supplied).  COA also explicitly stated it intended to file another report titled, "The FTC and the Guides Concerning Endorsements: Why the Change?."  *Id.*  Both FTC and the district court refused to consider this information in light of COA's third FOIA request, but instead found the issue of fee waivers "moot."  A397.

COA is a nonprofit, nonpartisan 501(c)(3) government accountability organization that advocates for economic freedom and opportunity by educating the public about the threat posed by improvident federal regulations, spending, and cronyism.  A008; A020-21; A030.  To carry out its educational mission, COA investigates federal agency over-reach and then publicly disseminates its findings through two periodical newsletters, *Cause of Action News* and *Agency Check*, a high traffic website, and through social media networks including Facebook and Twitter.  A027; A030; A048-50; A155-56; A159; A181-83.

COA began operating on August 15, 2011 and soon thereafter, its work and findings began being featured in "traditional" high-profile media publications.  *See* A331-36; *see also* A031, n.11; A047, n.8; A155, n.7; A183, n. 25.

FTC's unreasonable refusal to grant COA news media requestor status and a public interest fee waiver resulted in the submission of three successive, distinct FOIA requests regarding the Guides as well as the operative issue of fee waivers.  A009–018.  COA lodged a series of discrete appeals and requests for reconsideration.[2]  However, at every turn, FTC played a game of administrative hide-and-seek by failing to provide a fee agreement under 16 C.F.R. § 4.8(d)(3)

---

[2] COA's third FOIA request was filed at the express suggestion of an Office of Government Information Services (OGIS) representative when FTC refused to engage in mediation of this dispute.  A016.

(2012), thereby violating its own regulations.[3]  FTC denied COA news media

requestor status and a public interest fee waiver for FOIA requests one and two,

and unilaterally declared the fee waiver and media requestor status moot for

request three.[4]  *Id.*

      At all times, COA acted in good faith to secure the requested information, as

the circumstances of Request Three demonstrate.  *See supra* notes 2 & 3.  If only

FTC had followed FIRA and the OPEN Government Act, this case would not have

been necessary.

## III.    FTC's Tripartite Denial: COA's FOIA Fee Waivers And Requests For News Media Requestor Status.

### A.    FOIA Request One (FOIA-2011-01431): August 30, 2011.

      On November 28, 2008, FTC proposed to regulate on-line testimonials and

consumer product endorsements by social media authors and bloggers.  *See* Guides

Concerning the Use of Endorsements and Testimonials in Advertising, 73 Fed.

Reg. 72,374, *adopted in* 74 Fed. Reg. 53,124 [hereinafter the Guides]; *see also*

A009 ¶ 10.  This rule was finalized on October 15, 2009.  74 Fed. Reg. 53,124

---

[3] "If the [fee agreement] required by this section is absent, and if the estimated fees exceed $25.00, *the requester will be advised of the estimated fees* and the request will not be processed until the requester agrees to pay such fees."  16 C.F.R. § 4.8(d)(3) (emphasis supplied).
[4] Cause of Action will refer to its August 30, 2011 FOIA (FOIA-2011-01431) as Request One, to its October 28, 2011 FOIA (FOIA-2012-00227) as Request Two, and to its January 27, 2012 FOIA (FOIA-2012-00687) as Request Three.  A375-78.

(2009) (codified at 16 C.F.R. §§ 255.0-255.5).  Among other things, the Guides

required social media authors and bloggers to disclose their relationships "with a

seller of the product or service that they have endorsed."  A009 ¶ 9.

In or about August 2011, COA received reliable information[5] that FTC was

unfairly and inequitably enforcing the Guides based on requestors' political views,

and infringing free speech rights.  A009 ¶ 10; A342 ¶ 3 (Epstein Decl.).  Therefore,

on August 30, 2011, COA submitted Request One for documents relating to FTC's

drafting, formulation, and revision of the Guides.  A009 ¶¶ 10-11; A020; A342 ¶ 4.

In a phone call with FTC on September 14, 2011, COA narrowed its request

to the drafting, formulation, and revision of the Guides generated between January

1, 2009 and September 6, 2011, and *concerning social media authors*.  A024

(emphasis supplied).  COA requested a public interest fee waiver and news media

requestor status.  A021.

On September 22, 2011, FTC denied the public interest fee waiver.  A025.

COA appealed FTC's denial of the public interest fee waiver request on September

26, 2011.  A026-27.  On October 7, 2011, FTC denied COA's appeal.  A028.

---

[5] As of August 2011, FTC was on notice that Request One would elicit documents
and information critical of FTC's actions in unfairly and inequitably enforcing the
Guides.  "It has come to our attention [that FTC] has begun to initiate
investigations and enforcement actions against businesses or individual bloggers
who may have violated [FTC's Guides].  *Because disclosure requirements put
restrictions on the commercial speech of bloggers and other marketers, the FTC's
actions in this area justify close scrutiny*."  A020 (emphasis supplied).

FTC also denied COA's request for news media requestor status; instead FTC classified COA as an "Other (General Public)" requestor and provided 100 pages of records pursuant to its FOIA regulations.  *Id.*  Nathaniel Fairbanks Gray[6] indicated in his Declaration that he had located more than 100 pages of records by stating he had "*selected and reviewed 100 pages*" of responsive records.  A243 ¶ 14 (Gray Decl.) (emphasis supplied).  However, FTC never disclosed the *total* number of pages it located, nor did it advise COA of the estimated fees associated with this request as required by 16 C.F.R. § 4.8(d)(3).[7]

On December 20, 2011, FTC denied COA's appeals regarding Request One.  A040.[8]

––––––––––––––––––––

[6] Paralegal Specialist in FTC's Office of General Counsel who performed the initial FOIA search at issue, and who directed the second, including the search terms used.

[7] While FTC also acknowledged that COA sought records about how the Guides affected "social media authors," neither Mr. Gray nor Ms. Modell (an attorney in FTC's Bureau for Consumer Protection) used this search term when searching for responsive records.  *See* A241 ¶ 6; A242 ¶ 10.

[8] COA filed successive appeals for Request One on October 28, 2011 and December 12, 2011.  A029-31; A037-39.  COA again requested reconsideration of its public interest fee waiver and news media requestor status requests for Request One on January 27, 2012, A152-60, which FTC again denied on February 27, 2012.  A161-64.

### B.     FOIA Request Two (FOIA-2012-00227): October 28, 2011.

On October 28, 2011, COA submitted Request Two.  A041-43.[9]  On January

6, 2012, FTC denied COA's requests for a public interest fee waiver and news

media requestor status.  A050-51.

On January 27, 2012, COA appealed these denials.  A152-60.  FTC upheld

the denials on February 27, 2012.  A161-64.

### C.     FOIA Request Three (FOIA-2012-00687): January 27, 2012.

COA filed Request Three on January 27, 2012.[10]  This request was

substantively distinct on its face from Request One.  *Compare* A024 *with* A172-73.

Specifically, COA added "*bloggers*," which was another new media group affected

by adverse FTC action, in addition to "social media authors" and two more

categories of "fee waiver documents."  *Id.* (emphasis supplied).

COA again requested a public interest fee waiver and news media requestor

status, A180-84; *see also* A168-72, explaining that it would use its combined 20

years of experience in investigative reporting, government oversight, and federal

---

[9] This request sought all FOIA requests where FTC granted public interest fee
waivers from January 1, 2009 to October 28, 2011, and also all documents
referring to the process by which FTC determined such requests qualified for the
fee waiver.

[10] COA filed Request Three at the direction of OGIS because this would indeed
clarify and expand Request One to FTC in order to serve FOIA's scope and
purpose.  A308, A343 ¶ 14.  COA acted on OGIS's measured suggestion, but FTC
further obstructed OGIS's purpose (having refused to participate in mediation) by
declaring COA's January 27, 2012 request moot.

public interest litigation to turn FTC's raw data into distinct works that COA

would disseminate through social media outlets, its website, newsletters,

memoranda, press releases, and two published reports with specific titles.  *Id*.; *see*

*also* A168-72; A181; A184.  COA also explained that it would rely on a vast

network of connections with other news media organizations to further disseminate

stories that it would generate from the information collected from FTC.  A167-68.

Despite COA's detailed plans to disseminate its work to the public, FTC

denied COA news media requestor status and again categorized it as an "Other

(General Public)" requestor without explanation.  A174.  FTC also limited its

response to items two and three of Request Three, because it claimed that item one

was "a duplicate" of the August 30, 2011 request—a claim that wholly disregarded

the fact that item one actually *expanded* the scope of the August 30, 2011 request

and could not be "a duplicate."  *Id.* at n.1.  FTC ostensibly reached this conclusion

because it located fewer than 100 pages, which would have triggered a mandatory

fee waiver analysis.  *See* A174 n.1.[11]

On May 25, 2012, COA filed a complaint against FTC for violation of FOIA

requesting declaratory and injunctive relief.  A007-19.  On September 28, 2012,

---

[11] As with Request One, FTC did not disclose how many pages it located in
response to item one of this FOIA request, nor did FTC inform COA of the
estimated fees associated with this request.  *Id.*  COA also appealed FTC's denial
of news media requestor status.  A181-84.

FTC filed a motion for summary judgment, which was opposed by COA on November 28, 2012.  A260-343.  FTC filed its reply on January 25, 2013.  A344-72.

The district court granted FTC's motion for summary judgment with respect to the denials of public interest fee waivers and news media requestor status for Requests One and Two.  A373-418.  As to Request Three, the court affirmed FTC's denial of COA's fee waiver as moot, presuming FTC's mootness analysis equally applied to COA's request for news media requestor status and COA's public interest fee waiver request.  *Compare* A382-83 *and* A397-99 *with* A400.

The district court entered a Consent Judgment and final appealable Order on September 11, 2013.  A419.  On November 12, 2013, COA filed a timely Civil Notice of Appeal.  A420.

## SUMMARY OF THE ARGUMENT

The district court erroneously denied COA news media requestor status for Requests One, Two, and Three because the court failed to recognize COA as a representative of the news media under the OPEN Government Act.  COA, a textbook alternative media entity, demonstrated its capacity to gather information of potential interest to a segment of the public and expressed its intent to utilize its editorial skill to turn raw materials into distinct works.  It also demonstrated its intent and capacity to distribute its work to a reasonably broad audience interested

in how FTC interpreted and applied the Guides, particularly as to social media authors and bloggers.  To this end, COA identified numerous examples where it actively distributed information obtained through FOIA requests in the 2011-2012 timeframe.

The district court also erroneously determined that COA's Request Three was moot.  FTC cannot refuse to process a request merely because it is similar to an earlier request.  Moreover, the number of pages implicated by COA's Request Three was sufficient to trigger an analysis of COA's fee requests.

The district court also erroneously ignored FTC's failure to meet its burden to conduct an adequate search for records responsive to Request Three.

Finally, the district court erroneously determined that COA did not qualify for a public interest fee waiver although COA demonstrated that the information sought was (1) likely to contribute significantly to public understanding of the operations and activities of the government, and (2) was not primarily in COA's commercial interest.

FTC denied COA's requests for public interest fee waivers and news media requestor status knowing COA intended to criticize the agency for using the Guides to limit speech.  Groups with the "correct" political ideology, however, were give fee waivers.  Nonprofits, especially new nonprofits, are especially harmed by fee waiver and media status gamesmanship because they rely so heavily

13

on FOIA's fee waiver provisions in obtaining the information needed for government accountability and transparency.

The district court's opinion improperly rewrote FOIA, narrowing the scope of the news requestor and public interest fee waiver provisions.  This opinion, if allowed to stand, likely will devastate the community of organizations, scholars and individuals, many very thinly funded, that work to ensure government transparency and accountability.  For these reasons, the district court should be reversed and judgment granted COA.

## STANDARD OF REVIEW

FOIA cases receive the same de novo standard of appellate review applicable generally to summary judgments.  *Petroleum Info. Corp. v. Dep't. of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992); *Pub. Citizen v. U.S. Dist. Ct.*, 486 F.3d 1342, 1345 (D.C. Cir. 2007); *see also* 5 U.S.C. § 552(a)(4)(B).  On summary judgment, this Court must view the evidence in the light most favorable to the nonmoving party, and the Court may grant summary judgment only if there is no genuine issue of material fact and judgment is required as a matter of law.  Fed. R. Civ. P. 56; *Ctr. for Auto Safety v. Nat'l Highway Traffic Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006).

FTC must prove it performed an adequate search and responded appropriately to COA's FOIA requests.  5 U.S.C. § 552(a)(4)(B); *Weisberg v.*

14

*Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983) (the agency must

demonstrate "that it has conducted a search reasonably calculated to uncover all

relevant documents") (citation omitted); *Dep't of Justice v. Tax Analysts*, 492 U.S.

136, 142 n.3 (1989) ("The burden is on the agency to demonstrate, not the

requestor to disprove, that the materials sought are not agency records or have not

been improperly withheld.") (internal quotes and citation omitted).

     This Court reviews de novo FOIA fee waiver requests and requests for news

media status, and is limited to the record before the agency at the time of its

decision.  5 U.S.C. § 552(a)(4)(B); *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309,

1311 (D.C. Cir. 2003).  The requestor bears the burden of proving that it is entitled

to a fee waiver.  *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1126

(D.C. Cir. 2004).  However, "Congress amended FOIA to ensure that it be liberally

construed in favor of waivers for noncommercial requesters." *Rossotti*, 326 F.3d at

1312 (citation omitted).

## **ARGUMENT**

**I.    COA Is A "Representative Of The News Media."**

     Generally, FOIA requestors are responsible for paying the costs of search,

review, and duplication.  5 U.S.C. § 552(a)(4); *Larson v. Cent. Intelligence

Agency*, 843 F.2d 1481, 1482 (D.C. Cir. 1988).  However, a core purpose of FOIA

is public understanding of the operations or activities of the government.  *Dep't of*

*Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 774-75

(1989).  Therefore, Congress provided that "a representative of the news media"

does not have to pay FOIA search or review costs.  5 U.S.C.

§ 552(a)(4)(A)(ii)(II).[12]

The OPEN Government Act defines "a representative of the news media" as

follows:

> [T]he term "a representative of the news media" means any
> person or entity that gathers information of potential
> interest to a segment of the public, uses its editorial skills to
> turn the raw materials into a distinct work, and distributes
> that work to an audience.  In this clause, the term "news"
> means information that is about current events or that
> would be of current interest to the public.  Examples of
> news-media entities are television or radio stations
> broadcasting to the public at large and publishers of
> periodicals (but only if such entities qualify as
> disseminators of "news") who make their products
> available for purchase by or subscription by or free
> distribution to the general public.  These examples are not
> all-inclusive. Moreover, as methods of news delivery
> evolve (for example, the adoption of the electronic
> dissemination of newspapers through telecommunications
> services), such alternative media shall be considered to be

---

[12] This Court has long embraced the philosophy that the "representative of the news media" fee category must be "broadly interpreted if [FOIA] is to work as expected." *Nat'l Sec. Archive*, 880 F.2d at 1386. In fact, when promulgating model fee guidelines after the passage of FIRA, the Office of Management and Budget (OMB) referenced Senator Leahy's statements in the legislative history that explained the term should be "broadly" interpreted. *See* Uniform FOIA Fee Schedule & Guidelines, 52 Fed. Reg. 10,012, 10,014 (Mar. 27, 1987) [hereinafter OMB FOIA Guidelines].  Congress reinforced this view when it codified this Court's language from *National Security Archive* in the OPEN Government Act.

16

news-media entities.

5 U.S.C. § 552(a)(4)(A)(ii).

The district court wrongly failed to apply the OPEN Government Act.
A382-410.  It also ignored the Record demonstrating that COA was "alternative
media" with both the editorial skill and capacity to distribute information.  A020-
22; A026-27; A029-34; A037-39; A041-43; A045-49; A152-60; A165-73; A176-
84.  Therefore, it erroneously determined that COA was not a "representative of
the news media."  A400-06.

### A. FTC's Denial Of COA's Requests Was Erroneous And FTC's Regulation Was *Ultra Vires*.

At the time of COA's three FOIA requests, FTC regulations incorrectly
defined a "representative of the news media" as "any person actively gathering
news for an entity that is organized and operated to publish or broadcast news to
the public."  16 C.F.R. § 4.8(b)(2).  However, FTC's regulation was *ultra vires*,
and the agency's denials of COA's Requests thereunder were unlawful, because
the regulation contradicted the OPEN Government Act's mandate that "alternative
media shall be considered" a news media requestor.  *See Orion Reserves Ltd.
P'ship v. Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009) ("a regulation contrary to a
statute is void").

On March 21, 2014, FTC updated its regulations to comply with the OPEN
Government Act.  *See* FTC FOIA, Miscellaneous Rules, 79 Fed. Reg. 15,680 (Mar.

17

21, 2014); *see also* A158-59 (COA's Jan. 27, 2012 letter to FTC calling the

agency's regulatory deficiency to its attention).  But this action does not cure

FTC's wrongful denial of COA's three Requests and, on *ultra vires* grounds alone,

judgment for COA is proper.  "[C]ourts will 'ordinarily presume that Congress

intends the executive to obey its statutory commands and, accordingly, that it

expects the courts to grant relief when an executive agency violates such a

command.'"  *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996)

(citing *Bowen v. Mich. Acad. of Family Physicians,* 476 U.S. 667, 681 (1986)).

Regarding "the review of *ultra vires* actions . . . [w]hen an executive acts *ultra*

*vires,* courts are normally available to reestablish the limits on his authority."

*Reich*, 74 F.3d at 1328.[13]

### B. COA Meets The Statutory Test.

FOIA's plain language should lead to the conclusion that COA is a

"representative of the news media."  The ordinary meaning, context, statutory

structure, and legislative history all counsel a broad interpretation of the term

---

[13] *Reich* also cited *Dart v. United States,* 848 F.2d 217, 224 (D.C. Cir. 1988),
which in turn cited and analyzed *Am. Sch. of Magnetic Healing v. McAnnulty*, 187
U.S. 94, 108, 110 (1902) ("[A]cts of all [a government department's] officers must
be justified by some law, and in case an official violates the law to the injury of an
individual the courts generally have jurisdiction to grant relief. . . .  Otherwise, the
individual is left to the absolutely uncontrolled and arbitrary action of a public and
administrative officer, whose action is unauthorized by any law and is in violation
of the rights of the individual.").

"alternative media."  Among other things, the legislative history shows that Congress understood technological advancements and the changing face of news media required "alternative media" to be treated as news media requestors.

Statutory language is the starting point for statutory construction and legislative purpose is expressed in the ordinary meaning of the words used.  *Am. Mining Cong. v. Envtl. Prot. Agency*, 824 F.2d 1177, 1183 (D.C. Cir. 1987).  It is often necessary to understand statutory terms in context by examining the surrounding terms and overall statutory scheme.[14]  *See United Distrib. Cos. v. Fed. Energy Reg. Comm'n*, 88 F.3d 1105, 1165 (D.C. Cir. 1996) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").  In

---

[14] This case does not present a deference question because FTC has neither interpreted nor applied the statutory term "alternative media" during the time period relevant to this case.  In some instances, courts defer to agency interpretation of statutory terms.  For example, courts will defer to an agency's interpretation if a statutory term is ambiguous, the agency has provided an interpretation with the force of law, and the interpretation is a permissible construction of the statute.  *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).  If, however, an agency's interpretation is not contained in an authoritative document that carries the force of law, the interpretation may help guide the court to the extent it has the "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  No deference is warranted here because FTC has neither interpreted nor applied the statutory term "alternative media" in this case.

addition to context, courts are often guided to a term's ordinary meaning by examining legislative history.  *See Nat'l Sec. Archive*, 880 F.2d at 1383-85.

FOIA defines the term "representative of the news media" to mean "any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience."  5 U.S.C. § 552(a)(4)(A)(ii).  This language tracks this Court's holding in *National Security Archive*.  880 F.2d at 1387 ("A representative of the news media is, in essence, a person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience.").

Adoption of the *National Security Archive* test and the addition of the term "alternative media" to FOIA demonstrate that Congress understood technology was changing the way news media requestors disseminated information obtained under FOIA.  *See also EPIC*, 241 F. Supp. 2d at 14 (recognizing Department of Defense's regulatory language—which Congress adopted—"anticipates technological advancements").

      **1.     Neither FTC nor the district court interpreted or applied the term "alternative media," therefore it is appropriate that this Court do so.**

The term "alternative media" is not defined in the Merriam-Webster or Oxford Dictionaries. However, "alternative" is defined as "relating to behavior that is considered unconventional and is often seen as a challenge to traditional norms." *See Alternative*, Oxford Dictionaries, http://goo.gl/PYBvRv (last visited May 5, 2014). Reading the full statutory definition, it is apparent Congress was comparing "alternative media," and their methods of news distribution, to traditional media such as television and radio stations. *See* 5 U.S.C. § 552(a)(4)(A)(ii). The sentence structure indicates that "such alternative media" also qualify for news media status, with "such" referring back to organizations that are using evolving methods of news delivery. *Id*. Further, the parenthetical interposed in the definition provides media is "alternative" if it "disseminat[es] . . . [information] through telecommunications services." *Id*. The Record demonstrates that COA was "alternative media" for purposes of the FOIA. For example, COA repeatedly stated that it "routinely and systematically disseminate[d] information to the public in several ways," namely, an e-mail newsletter, website, Twitter, and Facebook. A048; A157-60; A181-84.

Moreover, the touchstone for COA's qualification as a member of "alternative media" was the OPEN Government Act, which COA undeniably argued both to FTC and the district court. A171-73; A181-84; A294-96.[15]

### 2. The legislative history of the OPEN Government Act demonstrates Congress intended organizations like COA to be representatives of the news media.

The legislative history confirms COA should be considered "alternative media" and a "representative of the news media." 153 Cong. Rec. S10,986 (daily ed. Aug. 3, 2007); *Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 669 (D.C. Cir. 1994). OPEN Government Act co-sponsor Senator Patrick Leahy stated the amendments would "ensur[e] that anyone who gathers information to inform the public, including freelance journalist and bloggers, may seek a fee waiver when they request information under FOIA." 153 Cong. Rec. at S10,987. He also stated the new definition of "a representative of the news media" covered "Internet blogs and other Web-based forms of media . . . free newspapers and individuals performing a media function who do not necessarily have a prior history of publication." *Id*. Co-sponsor Senator John Cornyn affirmed Senator Leahy's view that the new definition "grants the same privileged FOIA fee status

---

[15] The notion that COA's Third Request was "moot" is entirely irrelevant when considering the district court's failure to evaluate COA's news media requestor status by virtue of the OPEN Government Act. This is so because COA's January 27, 2012 letter, in addition to advancing COA's Third Request, also contained an appeal of FOIA Requests One and Two. A165-73.

currently enjoyed by traditional media outlets to bloggers and others who publish reports on the Internet." *Id*. at S10,990.

**C.    Grounds For Reversing The District Court.**

**1.    The district court erroneously ignored the OPEN Government Act.**

In its January 27, 2011, appeal of Request Two, COA informed FTC that it violated the OPEN Government Act.  A171.  Yet FTC paid no heed.  COA called FTC's deviation from the statute to the district court's attention, A294-95, but the district court failed to apply the OPEN Government Act test.  Instead, it erroneously applied the *National Security Archive* test without accounting for the Congressional directive that "alternative media shall [also] be considered to be news-media entities."  5 U.S.C. § 552(a)(4)(A)(ii).

**2.    The district court erroneously held that COA did not possess "editorial skills to turn raw materials into a distinct work."**

A news media requestor must use "editorial skills to turn raw materials into a distinct work."  5 U.S.C. § 552(a)(4)(A)(ii).  "Editorial skill" is the ability to research and synthesize information, including connecting disparate information sources, to communicate a coherent story to an audience and to distinguish valuable from irrelevant information.  *See EPIC*, 241 F. Supp. 2d at 11, 13 (finding editorial skill includes "evaluat[ing] the newsworthiness of materials," putting "facts and issues in context," and determining "what is newsworthy for [an]

23

audience"); *Fed. CURE v. Lappin*, 602 F. Supp. 2d 197, 202 (D.D.C. 2009);

*Carney v. Dep't of Justice*, 19 F.3d 807, 815 (2d Cir. 1994).

A news media requestor must also use raw materials to create a distinct

work. 5 U.S.C. § 552(a)(4)(A)(ii). That work may include materials "from a

variety of sources, including material obtained under FOIA." *EPIC*, 241 F. Supp.

2d at 13. However, the statute does not require a requestor to use a variety of

sources. 5 U.S.C. § 552(a)(4)(A)(ii). And neither does this Court. *See Nat'l Sec.

Archive*, 880 F.2d at 1387.

The district court held that to "satisfy the second element, [COA] *must*

demonstrate that it would use information from a range of sources to independently

produce a unique product." A402 (emphasis supplied). The district court then

compared COA to the requestor in *National Security Archive*, who satisfied this

element by "gathering raw materials from a wide variety of sources in addition to

the FOIA requests." *Id*. The district court then erroneously found "COA did not

indicate . . . that it would use any information beyond that obtained in the FOIA

requests" and wrongly held COA did not qualify for news media requestor status.

A403.

The district court erred for at least two reasons. First, the court misread

*National Security Archive*'s multiple-source requirement. Second, COA did in fact

indicate that it gathers information from a wide range of sources.

24

First, a representative of the news media may demonstrate its editorial skill through a range of factors. Courts in this Circuit have examined the analytic capacity, staff experience level, ability to synthesize information, ability to cull relevant from irrelevant documents, and gathering information from multiple sources as factors that together comprise an organization's editorial skill. *See EPIC*, 241 F. Supp. 2d at 11, 13; *Fed. CURE*, 602 F. Supp. 2d at 202. However, none of these "activities is either necessary or sufficient" to demonstrate editorial skill. *Nat'l Sec. Archive*, 880 F.2d at 1387.

The types of sources courts find beneficial to a requestor's claim for news media status include: "FOIA requests, state and federal courts, government agencies, universities, international groups, law reviews, interest groups, and even other news stories." *EPIC*, 241 F. Supp. 2d at 11. Yet this Circuit has never required an organization to use multiple sources in publications following each and every FOIA request, and it should not do so here.

Second, COA demonstrated that consistent with common-sense investigative journalistic practices it gathers information from a "wide variety of sources." A171. For example, in just its fourth month of existence, COA obtained a previously unavailable audit showing "NeighborWorks America, a taxpayer-funded federal nonprofit . . . funneled more than $26.5 million in federal foreclosure-avoidance money to ACORN . . . 'evidence [of] extensive relationships

25

between both organizations that may undermine claims of an 'arm's length relationship' between them.'"  Matthew Vadum, *Obama Uses Taxpayers Cash to Back ACORN Name Changes Used to Dodge the Law*, Wash. Times, Nov. 28, 2011.  A167 n.7; SA-114 to -15.

COA's January 27, 2012 appeal of FTC's denial of Request Two also detailed how COA "analyzes relevant data [and] evaluates the newsworthiness of the material" it receives through FOIA.  A171.  For example, COA synthesized information it obtained under FOIA with the then-ongoing debate over the National Labor Relations Board's lawsuit against Boeing.  A167 n.7; *see EPIC*, 241 F. Supp. 2d at 11 (stating with approval the synthesis of FOIA information with "other news sources").

FTC's summary judgment motion did not allege that COA lacked editorial skill.  A199-200 (arguing COA's fee status denial was based on lack of ability to disseminate).  Even so, in COA's opposition to that motion, COA again established its "experienced professionals would use their then combined fifteen . . . years of experience in investigative reporting, government oversight and public interest litigation to apply their analytical and editorial skills to 'turn raw materials'—FTC data—'into distinct work.'"  A270.  Instead of considering these arguments, the district court inappropriately elevated the "various sources" factor to a dispositive test and incorrectly held COA did not meet that test.

26

### 3.    The district court erroneously discounted COA's publication history and demanded unreasonable specificity as to future publications.

The district court erroneously determined COA would not produce a "distinct work."  5 U.S.C. § 552(a)(4)(A)(ii).  First, it wrongly discounted COA's past publication history.  Second, it unreasonably demanded COA to prove with oracular specificity what it would publish in the future.

The district court wrongly held COA did not "independently produce a unique product."  A402.  To support this determination, it summarized COA's past publication history as "unspecified information it posts on its website, social media sites such as Facebook and Twitter, and through an email newsletter it began publishing to subscribers beginning in September 2011, *after* it made its first FOIA request and just one month before it filed its second request."  *Id.* (emphasis original).  The district court then compared COA—an organization then a few months old—to EPIC, an organization that had published seven books.  *Id.*  The district court then held "COA did not indicate any distinct work it planned to create based on the requested information. . . ."  A403.

As a threshold matter, the district court mischaracterized the frequency and nature of COA's newsletter and thus came to an incorrect conclusion about COA's history of producing a unique product.  COA began operating on August 15, 2011, merely two weeks before it sent its first FOIA request to FTC on August 30, 2011.

27

A029-31.  Cause of Action published nine editions of its newsletter between filing

its FOIA request on August 30, 2011 and filing its request for reconsideration on

December 12, 2011.  SA-116 (publication history of COA's newsletter August –

December 2011); A048 (Dec. 12, 2011 letter informing FTC of COA's regularly

published newsletter).

This history should have been sufficient.  In *EPIC*, the Court stated that at "a

minimum, newsletters must be published regularly, over a period of time."  241 F.

Supp. 2d at 14 n.6.  In keeping with the FOIA's core purpose of promoting

disclosure and government transparency, "regular" publication has been broadly

construed.  For example, a fee waiver was granted by the court to an organization

with only nine distributed newsletters in four years.  *Fed. CURE*, 602 F. Supp. 2d

at 204 n.3.  And, even if COA had failed to demonstrate a prior publication history,

the co-sponsors of the OPEN Government Act foresaw that alternative media, like

COA, may not have the same publication history as previous generations of media.

*See* 153 Cong. Rec. at S10,987 (statement of Sen. Leahy) (amendments meant to

cover "individuals performing a media function who do not necessarily have a

prior history of publication").

Second, the district court unreasonably demanded COA prove that it would

publish information from the Requests in the future.  It held "COA did not indicate

any distinct work it planned to create based on the requested information. . . ."

28

A403.  In this the court erred, for it is manifestly unreasonable to require a FOIA

requestor to precisely outline what the requestor will produce before the requestor

knows what information the request will uncover.

In *Judicial Watch, Inc. v. Rossotti*, this Court ruled a requestor must show

"in detailed and non-conclusory terms—again, all that FOIA requires—exactly

how and to whom it will disseminate the information it receives."  326 F.3d at

1314.  However, that plan need not contain "pointless specificity."  *Id*.

In *Center for Public Integrity v. Department of Health & Human Services*,

the district court found "no indication . . . that [this Court] intended in all

circumstances to require a detailed game plan for the publication of information

requested through FOIA."  2007 U.S. Dist. LEXIS 56172 at *19-20 (D.D.C. Aug.

3, 2007).  In *Carney*, the United States Court of Appeals for Second Circuit

rejected the government's contention "that Carney was *required to prove* that his

articles and book would be published," 19 F.3d at 816 (2d Cir. 1994) (emphasis

supplied).[16]

─────────────────

[16] Of course, it is impossible for any requestor to provide an agency with an
absolute assurance the requestor will publish the information it receives from a
FOIA request.  This is especially true in the context of government oversight,
because the requestor does not know what they will uncover.  Indeed, an
organization would undermine its editorial skill claim if it *promised* an agency that
it would publish information obtained through FOIA regardless of what the
documents received were found to contain.  Therefore, the relevant question should
be whether the requestor publishes distinct works in general, not whether the

In any event, COA's September 26, 2011 appeal of FTC's initial denial specified that COA planned "to publicize the results of [the] inquiry into the [FTC's treatment of social media authors] by using editorial skill to create a new, distinct work." A026. COA did not assure FTC it would publish the information, but it did say the "disclosable portions of the requested information will be meaningfully informative" to the subject of the request. A027. Also, in its December 12, 2011 letter, COA informed FTC it would share "the resulting analysis [from documents produced in response to the request] with the public, either through memoranda, reports, or press releases." A046. Just this should have been sufficient. *Ctr. for Pub. Integrity*, 2007 U.S. Dist. LEXIS 56172, at *19-20.

### 4. The district court erroneously held COA did not have the intent and capacity to distribute information.

In addition to gathering information of public interest and transforming that information into a distinct work with editorial skill, a news media requestor must "distribute" that work to an audience, 5 U.S.C. § 552(a)(4)(A)(ii),[17] and

---

requestor will absolutely create a distinct work with the materials received in a given FOIA request.

[17] The district court also included an outdated requirement that COA "must demonstrate that its operational activities are especially organized around" distribution. A403 (citing *EPIC*, 241 F. Supp. 2d at 12-13). OMB first created the "organized and operated" requirement in its model guidelines for the 1986 FOIA Amendments. *See* OMB FOIA Guidelines, 52 Fed. Reg. at 10,015. FTC's outdated regulations also contain the phrase. *See* 16 C.F.R. § 4.8(b)(2) (2012).

demonstrate both the intent and capacity to distribute information. *Nat'l Sec. Archive*, 880 F.2d at 1386-87.

The requestor must actively distribute its work; "merely making information available to the public" is not sufficient.[18]  *Judicial Watch, Inc. v. Dep't of Justice*, 122 F. Supp. 2d 13, 20 (D.D.C. 2000).  To determine intent and distribution capacity, courts must examine the totality of a requestor's history, its stated intent, and its ability to distribute information.  *Id.*

Neither FTC nor the district court disputed COA's intent to distribute.  At issue here was whether COA had the capacity to actively do so.  A403-06.  Courts examine many factors when considering a requestor's capacity to actively distribute information.  *Judicial Watch*, 122 F. Supp. 2d at 21; *but see* 153 Cong. Rec. at S10,987 (statement of Sen. Leahy) (OPEN Government Act covers those "who do not necessarily have a prior history of publication").  Active distributors display "a firm intent to disseminate" information.  *Judicial Watch*, 122 F. Supp. 2d at 21.  They "get[] the documents for [their] own purpose, which is to assemble them . . .  [and] then offer [them] to the public.  *Nat'l Sec. Archive*, 880 F.2d at 1387.  "Passive" distributors merely make  FOIA requests as an agent for others"

_____

However, Congress chose not to adopt the phrase when it codified the new definition of "a representative of the news media" in the OPEN Government Act.
[18] *But see EPIC*, 241 F. Supp. 2d at 14, where the court looked favorably on EPIC because it "makes its newsletter, as well as its archive of past newsletters, easily accessible . . . ."

31

and "purport to act on behalf of specific parties . . . [who] themselves are either

unaware that they could get records directly from the Government, or simply find

it more efficient to employ a service."  *Id.*[19]

Neither FTC nor the district court questioned COA's intent to distribute

information obtained through the Requests.  But the district court erroneously held

that COA was akin to "a middleman for dissemination to the media," not an active

distributor, and thus not a representative of the news media.  A406.  COA was an

active distributor of information that demonstrated a firm intention to "disseminate

any documents it acquires from these requests to the public."  A167.  COA

maintained its own channels of distribution and does not rely solely on other

entities to disseminate its information.  The district court recognized and recounted

COA's channels of distribution, including COA's "periodical newsletter, website,

social media sites, and media contacts . . . ."  A404.  However, as it did throughout

its decision, the district count discounted these new avenues of dissemination and

failed to account for the OPEN Government Act's command that "as methods of

_____

[19] One example of passive distribution is a repository "such as a library which
stores information and makes it available on demand."  *Ctr. for Pub. Integrity*,
2007 U.S. Dist. LEXIS 56172, at *11-12; *see also* OMB FOIA Guidelines, 52 Fed.
Reg. at 10,015 (distinguishing active and passive distributors).  The "active" /
"passive" distinction does not work well in the on-line world.  *See* Michael Russo,
*Are Bloggers Representatives of the News Media Under the Freedom of
Information Act?*, 40 Colum. J.L. & Soc. Probs. 225, 250-51 (2006) (discussing the
difficulty of applying the active-versus-passive test to online news media
organizations).

news delivery evolve . . . [including] electronic dissemination . . . through telecommunications services, such alternative media shall be considered to be news-media entities."  5 U.S.C. § 552(a)(4)(A)(ii).

The district court also erroneously held that disseminating information through media contacts is not evidence of active distribution.  A404-05 (citing *Hall v. Cent. Intelligence Agency*, 2005 U.S. Dist. LEXIS 6638, at *22 n.11 (D.D.C. Apr. 13, 2005)).  The district court takes the *Hall* footnote out of context.  In that case, the district court found that plaintiff Accuracy in Media misstated the burden of proof, offered no specific publishing activities, and tried to claim its chairman of board's personal credentials to news media status.  *See id.* at *22.

The relevant question is not whether COA "borrowed" its media contacts' credentials wholesale, but whether media contacts may be considered alongside other avenues of dissemination when demonstrating active distribution.  In other cases, courts have held that they may.  *See EPIC*, 241 F. Supp. 2d at 13-14.

In *Carney*, the Second Circuit looked favorably on the requestor's assertion that although he was a student, he had written two newspaper articles on the subject in question.  19 F.3d at 810.  It also found the "relevant inquiry . . . is whether the requestor will disseminate the disclosed records to a reasonably broad audience of persons interested in the subject."  *Id*. at 815.  Certainly other members

of the media may constitute "persons interested in the subject" of the government oversight COA conducts.

COA cannot plausibly be considered a passive information source.  It is neither a library nor a repository.  It does not act as an agent for others and make FOIA requests on their behalf.  COA actively distributes information through its multiple channels of electronic dissemination and media contacts, just as Congress envisioned in the OPEN Government Act.

The district court failed to recognize that, despite having only been in existence for less than a year, COA's past and future activities, distribution mechanisms, frequency of publication, and range of recipients are analogous to many of the requestors that have been granted news media status in this Circuit.

A requestor's publication history may be indicative of its future capacity to publish information.  However, "general statements about . . . past activities are not specific enough" to satisfy this inquiry.  *Judicial Watch*, 122 F. Supp. 2d at 21.  Instead, courts are looking for groups that have "taken, and will continue to take, an active role in disseminating information of current interest to the public."  *Ctr. for Pub. Integrity*, 2007 U.S. Dist. LEXIS 56172, at *15.  Thus, there is a nexus between past activities and future intent to publish.

In *Rossotti*, this Court ruled a requestor must show "in detailed and non-conclusory terms—again, all that FOIA requires—exactly how and to whom it will

34

disseminate the information it receives." 326 F.3d at 1314. However, that plan

need not contain "pointless specificity." *Id*. The D.C. District Court applied the

*Rossotti* decision by finding "no indication . . . that [this Court] intended in all

circumstances to require a detailed game plan for the publication of information

requested through FOIA." *Ctr. for Pub. Integrity*, 2007 U.S. Dist. LEXIS 56172,

at *19-20. In *Carney*, the Second Circuit Court of Appeals "reject[ed] the

[Department of Justice's] contention that Carney was *required to prove* that his

articles and book would be published," 19 F.3d at 816 (emphasis supplied).

 COA demonstrated a past history of distribution and a future likelihood to

do so again. COA informed FTC of its general capacity to distribute information

"through its website . . . which also includes links to thousands of pages of

documents" from FOIA and its other substantive work. A167. COA informed

FTC that—just as in *EPIC*—it maintains "contacts with news media organizations

that regularly feature our work." *Id*. COA detailed to the court below the list of

"extensive[] high profile media publications" showing interest in COA's work in

2011-2012. A262. COA listed eighteen examples of other members of the news

media also showing interest in its work. A167 n.7. COA also distributed

information through the social media platforms Twitter and Facebook. *Id*. When

broadly interpreting this fee category, COA's showing of general capacity meets

the standard from *Rossotti* and *Center for Public Integrity*.

Furthermore, a requestor may use a wide range of methods to demonstrate capacity to distribute information.  Publishing newsletters is one valid method. OMB FOIA Guidelines explain "publishers of newsletters are included within OMB's definition" of news media.[20]  *EPIC*, 241 F. Supp. 2d at 13 (citing OMB FOIA Guidelines, 52 Fed. Reg. at 10,014).  In *EPIC*, the court reasoned the "fact that [a] newsletter is disseminated via the Internet to subscribers e-mail addresses does not change the analysis."  *Id.* at 14.  In *National Security Archive*, this Court granted news media status even though the organization "previously published only one book."  880 F.2d at 1386.  In *EPIC*, the organization had "publication to date of seven books" and was granted news media status.  241 F. Supp. 2d at 11. The *EPIC* court wrote that at "a minimum, newsletters must be published regularly, over a period of time."  *Id*. at 14 n.6.  In *Fed. CURE*, the organization published only nine newsletters in four years.  602 F. Supp. 2d at 204 n.3.

Here, the district court inappropriately dismissed many of the mechanisms used by COA (and others) to distribute information.  The court minimized COA's "periodical newsletter, website, social media sites, and media contacts. . . ."  A404. However, Senator Leahy made clear that "Internet blogs and other Web-based

---

[20] FTC's FOIA regulations did not explicitly include or exclude newsletters.  *See* 16 C.F.R. § 4.8(b)(2).

forms of media" are relevant under the OPEN Government Act test. 153 Cong. Rec. at S10,987.[21]

In addition to methods and frequency, courts also examine the range of recipients to which an organization distributes information. In *Tax Analysts v. Dep't of Justice*, this Court ruled the "fact that [Tax Analysts'] readership is relatively small and largely composed of tax attorneys, accountants and economists is irrelevant to the point" that it is a news media organization. 965 F.2d 1092, 1095 (D.C. Cir. 1992). COA's readership includes individuals that are interested in monitoring government and assuring transparency and accountability. A158, A171-72. This segment of the public interested in the subject of Cause of Action's work is sufficiently broad to satisfy this Court's standards and the district court was wrong to hold otherwise.

---

[21] News media status should be broadly construed to accomplish FOIA's goals. The changing face of news media requires that new organizations be given the jurisprudential latitude to gain access to the information necessary to grow the organization. This is especially true for nonprofit news organizations "who depend on FOIA to supply their lifeblood—information." *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 94 (D.C. Cir. 1986). Just as "a newly established newspaper would be able to [qualify for news media status] by demonstrating that it had held itself out for subscription and had in fact enrolled subscribers," so too should a newly established publisher of an online newsletter qualify for news media status. OMB FOIA Guidelines, 52 Fed. Reg. at 10,015.

II.    **Weaponized FOIA Fee Waivers: FTC Wages War Against Nonprofits Critical Of FTC In The Age Of New Media**

A.    **FTC Denied Cause Of Action Fee Waivers Because The Agency Knew Cause Of Action Intended To Publish Articles Critical Of FTC.**

Both Congress and this Court have recognized the vital role nonprofits such as COA play in monitoring government activities, and challenging those activities when appropriate.  Prior to FIRA, Congress was concerned that executive agencies were utilizing search and copying fees to prevent oversight of their activities:

> Indeed, experience suggests that agencies are most resistant to granting fee waivers when they suspect that the information sought may cast them in a less than flattering light or may lead to proposals to reform their practices.  Yet that is precisely the type of information which the FOIA is supposed to disclose, and agencies should not be allowed to use fees as an offensive weapon against requesters seeking access to Government information. . . .

132 Cong. Rec. S14,298 (daily ed. Sept. 29-30, 1986) (statement of Sen. Leahy); Pub. L. 99-570.  FIRA specifically stated "that regulations to implement such amendments *shall be implemented* by [April 25, 1987]."  Pub. L. 99-570 § 1804(b)(1) (emphasis supplied).  This applied to all federal branch executive agencies, without exception.

FTC ignored Congress and refused to amend its regulations to comply with FIRA regarding public interest fee waivers or news media requestor status.

38

Congress enacted the OPEN Government Act, in large part, to define the term "representative of the news media" to include "alternative media." OPEN Government Act at § 3 ("Protection Of Fee Status For News Media"). COA clearly demonstrated that it qualified as a representative of the news media under the 2007 standard.[22] *Id.*; *Nat'l Sec. Archive*, 880 F.2d at 1386; *EPIC*, 241 F. Supp. 2d at 12-15.

COA paid a steep price for its stated dedication to government transparency and accountability and its promise to strictly scrutinize FTC's potential violations of the First Amendment under the Guides: an inability to obtain information essential to the commercial speech rights of social media authors and bloggers. FTC's denial allowed it to keep secret its documents regarding "the drafting, formulation, and revision of the Guides," A172, and to impair the rights of social media authors and bloggers nationwide.

The Record demonstrates that FTC brandished FOIA's fee waiver provisions as both sword and shield against COA's FOIA requests to protect FTC from

-----

[22] FTC flouted the OPEN Government Act by refusing to amend its regulations to bring the agency into compliance with the law and ignoring the critical definition of the term "representative of the news media" to include "alternative media" such as websites, e-mail, electronic newsletters, Facebook, Twitter, and other methods of information dissemination by electronic means. OPEN Government Act of 2007, § 3 (amending 5 U.S.C. § 552(a)(4)(A)(ii)). The fact of the matter is FTC did not substantively amend *any* of its FOIA regulations during the time period relevant to this case. FTC chose instead to ignore the law.

criticism for restricting the speech rights of social media authors and bloggers. A020-21; A045-49; A152-60; A176-84.

FTC weaponized FOIA fee waivers in this case against COA as an offensive tactic because COA's use of the information would cast a suspicious eye upon the agency's actions and restrictions visited upon social media authors and bloggers based on the Internet Advertising Guides. FTC did not deny COA fee waivers because the standard was not met. In a rather insidious manner,[23] FTC denied fee waivers to COA because the agency knew that disclosure of the information would "cast them in a less than flattering light" and may have led "to proposals to reform their practices." 132 Cong. Rec. S14,298 (daily ed. Sept. 29-30, 1986) (statement of Sen. Leahy).

FTC, then, preferred darkness to transparency, excuses to accountability. FTC is the agency Senator Leahy warned of in 1986. FTC is the agency training

---

[23] The Record here is replete with examples of FTC granting fee waivers to entities with little or no information supporting public interest fee waivers or news media requestor status. A060-62, A130 (American Federation of Government Employees, AFL-CIO); A065–67, A131 (Public.Resource.Org); A081-82, A136 (Marin Institute); A099, A143 (Consumer Watchdog); A111-12, A146-47 (Environmental Working Group). These entities provided terse, conclusory statements at best regarding respective qualifications for fee waivers, yet the waivers were granted by FTC. COA was denied fee waivers and new media requestor status with far more detail and information. A020-22; A026-27; A029-34; A037-39; A041-43; A045-49; A152-60; A165-73; A176-84. Again the district court ignored these vital comparisons which demonstrated that COA was being singled out for disparate treatment by FTC.

its fire on nonprofits like COA and others in the FOIA community shining the light on FTC's policies, practices, and procedures.

FTC has repeatedly ignored Congress's amendments to FOIA since 1986, particularly the OPEN Government Act.  FTC has contemptuously disregarded the law and gotten away with it.

This Court should hold FTC accountable.

**B.     FTC's Fee Waiver Denials Chill Free Speech For Nonprofits And Acts As An Impediment To Agency Oversight.**

This Court has made clear that selectively denying fee waivers to start-up nonprofits such as COA is unacceptable, precisely because such organizations make "FOIA requests that potentially would not be made absent a fee waiver provision." *Better Gov't Ass'n*, 780 F.2d at 93.  Like the nonprofit organizations in *Better Government Association,*[24] COA relies "heavily and frequently on FOIA and its fee waiver provisions to conduct the investigations that are essential to the performance of certain of [its] primary institutional activities—publicizing governmental choices and highlighting abuses that otherwise might go undisputed and thus unchallenged." *Id.*

---

[24] "BGA is a nonprofit organization that conducts investigations designed to expose waste, fraud and abuse in the functioning of government programs. . . . NWF is a nonprofit organization 'dedicated to the promotion of conservation principles on behalf of a large national . . . constituency.'" *Better Gov't Ass'n*, 780 F.2d at 90 (note omitted).

41

The district court's decision prevents the functionality and mission of start-up nonprofit entities which are critical members of the FOIA community whose mission is government accountability and transparency.[25]

Furthermore, the decision to deny COA's fee waiver requests impedes critical "access to information for precisely those groups Congress intended to aid by the fee waiver provision," and continues to inflict "hardship on the non-profit public interest groups who depend on FOIA to supply their lifeblood— information." *Id.* at 94.[26] Congress has made clear "its intent that fees should not be utilized . . . as 'toll gates' on the public access road to information." *Id.* (note omitted).[27] FTC's pattern here of denying fee waivers to organizations such as COA "'chill' the ability and willingness of [such] organizations to engage in activity that is not only voluntary, but that Congress *explicitly wished to encourage*." *Id.* (emphasis supplied); *see* A337-41 (FTC denial rate for fee

---

[25] "A requester is likely to contribute significantly to public understanding if the information disclosed is new; supports public oversight of agency operations; or otherwise confirms or clarifies data on past or present operations of the government." 132 Cong. Rec. H9,464 (daily ed. Oct. 8, 1986) (statements of Reps. English & Kindness).

[26] *See* S. Comm. on the Judiciary (Amending FOIA), S. Rep. No. 854, 93d Cong., 2d Sess. 11-12 (1974) (cited in *Better Gov't Ass'n*, 780 F.2d at 89, 94).

[27] *See* Subcomm. Rep. on Admin. on Practice & Procedure of the S. Judiciary Comm. (Agency Implementation of the 1974 Amendments to [FOIA]: Rep. on Oversight Hearings), 95th Cong., 2d Sess. 90-96 (1980) (cited in *Better Gov't Ass'n*, 780 F.2d at 89, 94).

waivers was *89.38 %*, compared with a mean denial rate of *43.61%* for *all other agencies* reporting fee waiver data).

As a 501(c)(3) nonprofit, COA must be permitted to rely on FOIA's fee waiver provisions to educate the public and conduct the investigations essential to fulfilling its mission.  Finally, the district court's ruling prevents COA, and other similarly situated nonprofits, from realizing the true scope and purpose of FOIA: active oversight of the policies and actions of executive branch agencies such as FTC.  Fee waiver provisions should not be countenanced as roadblocks to information vital in assessing government transparency and accountability.  Only in this way can COA and similarly situated organizations educate the American people regarding "know what their government is up to."  *Reporters Comm. for Freedom of the Press*, 489 U.S. at 773 (citation omitted).

## III.    The District Court Erred In Finding That Fee Issues Were Moot For Cause Of Action's January 27, 2012 FOIA Request.

Fee category and fee waiver requests in FOIA matters become moot when there are no fees associated with the request and the requestor "has obtained everything that [it] could recover."  *Hall v. Cent. Intelligence Agency*, 437 F.3d 94, 99 (D.C. Cir. 2006) (holding that agency's release of documents without seeking payment mooted plaintiff's "arguments that the district court's denial of a fee waiver was substantively incorrect"); *see also Hall v. Cent. Intelligence Agency*, 668 F. Supp. 2d 172, 195 (D.D.C. 2009) (finding that plaintiff's fee status was

43

moot where agency decided, as a matter of administrative discretion, to give plaintiff same treatment as representative of the news media). These circumstances are not present in this case.

In affirming FTC's determination that fees were moot for COA's Third Request, the district court relied upon FTC's assertion that the agency had found fewer than 100 responsive pages—the threshold for triggering duplication fees for non-commercial requestors[28]—and that it had released seventy-nine pages free of charge. A397, A400. This was reversible error because FTC in fact possesses *more than* 100 pages responsive to COA's request. The page count reported by FTC was based solely upon items two and three of the request; FTC ignored altogether item one of the request because it deemed it to be "a duplicate" of Request One. A174 n.1. These requests are not facially duplicative.[29] But even if they were, it was plain error for FTC to ignore item one of Request Three, as discussed below, because COA added new information to the administrative record.

---

[28] *See* 5 U.S.C. § 552(a)(4)(A)(iv)(II). FTC designated COA as an "Other" requestor (i.e., non-commercial). A174.

[29] The first item of Request Three added the term "bloggers." *Compare* A020-22 *and* A024 *with* A159.

### A.     FTC Cannot Refuse To Process A Request Merely Because It Is Substantially Identical To An Earlier Request.

This Court and courts within this Circuit have recognized that requestors may file new, duplicative requests.  *See, e.g.*, *Spannaus v. Dep't of Justice*, 824 F.2d 52, 61 (D.C. Cir. 1987) ("Nothing prevents [a requestor] from requesting the same withheld documents decade after decade without ever bringing a timely suit to compel disclosure."); *see also Nat'l Sec. Counselors v. Cent. Intelligence Agency*, 931 F. Supp. 2d 77 (D.D.C. Mar. 20, 2013) (rejecting agency's contention that it "is not obligated to produce redundant records to the same requester").

In this case, COA made a substantially identical request for the Guides at the suggestion of OGIS "in order to clear up any confusion as to [COA's] purpose and intent to disseminate the requested information."[30]  A153, A270 & n.7.  This was necessary, in large part, because COA was established on August 15, 2011, A342 ¶¶ 7-8, only two weeks before it filed its first request with FTC on August 30, 2011.  Thus, COA's publishing practices and methods of dissemination were nascent and developing.

Requiring FTC to re-adjudicate COA's fee request with respect to the Guides would not "disserve the purposes of FOIA" by compelling the agency to

---

[30] OGIS is a FOIA resource for the public and the government.  Its mission includes "resolving FOIA disputes between Federal agencies and requesters."  *The Federal FOIA Ombudsman*, Office of Gov't Info. Servs., https://ogis.archives.gov/ (lasted visited May 5, 2014).

expend "scarce agency resource" in order to reconsider "static records." *Toensing v. Dep't of Justice*, 890 F. Supp. 2d 121, 140 (D.D.C. 2012).  In *Toensing*, the court concluded that when a requestor failed to exhaust his administrative remedies with regard to certain withheld records, and then filed a duplicative FOIA request for the same records in order to revive the previously unexhausted issues for litigation, the agency was not required to re-review the exact same records to indulge the requestor.  *Id.*

This case is clearly distinguishable from *Toensing*.  Aside from the fact that exhaustion of administrative remedies is not an issue here, FTC would not be required "to plow the same ground all over again."  *Id.*  In connection with Request Three, COA submitted updated information regarding its publishing practices in order to justify a public interest fee waiver and news media status.  A176-84.  As the district court acknowledged, COA's subsequent request presented new information for the administrative record.  A403 n.6.  Therefore, FTC should not be permitted to ignore item one of Request Three, even if it did seek the same records as Request One.  A requestor's ability to disseminate information can change over time, as well as its fee category.  *See, e.g.*, *Nat'l Sec. Archive*, 880 F.2d at 1388 (stating that court's determination of requestor's news media status is "not chiseled in granite"); *Long v. Dep't of Justice*, 450 F. Supp. 2d 42, 85 (D.D.C. 2006) (noting that "an entity's status can change").

**B.    The Number Of Pages Implicated By COA's January 27, 2012 Request Is Sufficient To Trigger An Analysis Of Cause Of Action's Fee Requests.**

FTC has yet to disclose how many pages it found in response to Request One—and, by extension, to Request Three.  *See, e.g.*, A025, A028, A035-36.  Instead, the agency has stated only that it "selected and reviewed" 100 pages and released them in full to COA without cost.  A243 ¶¶ 14-15 (Gray Decl.).  Despite FTC's opaqueness, the record nonetheless establishes that FTC located more than 100 responsive pages.  First, the fact that FTC "selected" 100 pages indicates, by definition, that those pages derive from a larger set of responsive records.  *See Select*, Merriam-Webster.com, http://goo.gl/H98gtL (last visited May 5, 2014) ("select, v." is "to choose . . . from a group").  Second, FTC would not have denied COA's fee requests and solicited a fee agreement unless fees were at stake.  *See* A025.  FTC "selected and reviewed" 100 pages not because it found precisely 100 pages, but because it was required to release "the first 100 pages of duplication" to an "Other" requestor.  16 C.F.R. § 4.8(b)(3).

Although only FTC knows exactly how many responsive pages exist, one can readily deduce from its regulations that the volume exceeds 200 pages.  When COA submitted its first FOIA request to FTC in 2011, the agency was required to waive all fees if the total "chargeable fees" were $14.00 or less.  16 C.F.R. § 4.8(b)(4) ("Waiver of small charges").  Duplication costs at that time were

fourteen cents per page. *Id.* § 4.8(b)(6). If FTC had found 200 or fewer releasable pages, it would have been required to disclose all of them to COA without cost and without a fee agreement.[31] But FTC released only 100 pages *and* asked for a fee agreement. A025, A027. Accordingly, FTC must have found at least 201 releasable pages, or $14.14 worth of records, which is beyond the threshold for the "[w]aiver of small charges." 16 C.F.R. § 4.8(b)(4).

### C. The District Court Erred In Not Finding That FTC Failed To Meet Its Burden To Conduct An Adequate Search For Records Pursuant To Cause Of Action's January 27, 2012 FOIA Request.

FTC failed to satisfy its burden to conduct a search "reasonably calculated to uncover all relevant documents." *Weisberg v. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983). FTC ignored the first item of Request Three, and prematurely concluded that this request yielded too few pages to trigger a fee waiver analysis. FTC's intentional omission denied COA the opportunity to "obtain[] everything that [COA] could recover." *Hall*, 437 F.3d at 99.

As set forth at Section III.B *supra*, had FTC considered the entire FOIA request, including item one, it would have identified more than 100 pages, and this would have triggered a mandatory fee waiver and fee category analysis. COA's fee waiver and fee category requests cannot be moot before FTC first discloses

---

[31] Non-commercial requestors, like COA, receive the first 100 pages free of charge. 16 C.F.R. § 4.8(b)(3). If the remaining pages consist of 100 or fewer pages, all fees would be waived. *Id.* § 4.8(b)(4).

how many records it located in response to Request One, wherein COA sought

information only regarding "social media authors."  FTC's Paralegal Specialist

Nathaniel Fairbanks Gray's Declaration stated he "selected and reviewed 100

pages" of responsive records, which clearly indicated FTC located more than 100

records in response to Request One.  A243.  It then follows that FTC must identify

how many records are responsive to the terms "social media authors" and

"bloggers" in Request Three.

Moreover, COA raised specific concerns regarding the adequacy of FTC's

search.  A176-79.  COA also specifically explained the problematic nature of

FTC's opaque representations concerning Request Three by stating that FTC's

handling of the request made administrative appeal highly difficult.  A179.  An

effective appeal is impossible if a requestor does not know "whether a document

exists and [does] not know the contents of a specific document."  *Id.*

Therefore, FTC *failed to properly search* item one of Cause of Action's

FOIA request.  A240-243, ¶¶ 5-15; *see Inturralde v. Comptroller of the Currency*,

315 F.3d 311, 313-14 (D.C. Cir. 2003) (explaining requirements for adequate

search).  The district court then committed reversible error when it found that COA

had not challenged the adequacy of FTC's search for responsive documents in this

litigation.  A293; A399-400; A176-79.

49

In retrospect, it is more than likely that FTC's refusal to conduct a search of item one was an artful act of chicanery. Having intentionally omitted key search terms[32] for the first request in September 2011, FTC compounded its duplicity in May 2012 by declaring item one of the January 27, 2012 request moot because it allegedly "duplicated" the first request.[33] While FTC's motives in effecting this scheme remain unknown, it is incontrovertible upon the facts in the Record that FTC **_never_** conducted an *adequate search* for these records because the first search was incomplete and the second never occurred. A176-79. Legerdemain as métier is no way for a federal executive agency to behave, especially when faced with its responsibilities under FOIA.[34]

---

[32] In a letter to COA dated September 22, 2011, FTC's Associate General Counsel Sarah Mathis agreed the search would focus on "social media authors." A024. Yet neither FTC's Nathaniel Fairbanks Gray nor Shira Modell, an attorney in the Bureau of Consumer Protection–Division of Advertising Practices, ever used "social media authors" or its variants, as a search term for the August 30, 2011 FOIA request. A242-43.

[33] Mr. Gray's actions in this instance are mysterious indeed. His Declaration states "[i]n consultation with my supervisor, [I] concluded that section (i) of [the January 27, 2012 request] was a duplicate of [the August 30, 2011 request]." A245. The supervisor remains unknown. More to the point, Mr. Gray knew, or should have known, that Cause of Action's First and Third Requests were substantively different as regards the terms "social media authors" *and* "bloggers." After all, he personally negotiated the narrowing of the first request to focus on "social media authors" as an essential search term. A023-24.

[34] COA qualified for news media status for Request Three as well. First, COA gathers information of potential interest to a segment of the public. The subject of the Request Three is similar to Requests One and Two: the social media "guides" and FTC fee waiver documents. A172-73. Second, COA demonstrated that it

The Record affirms that four other federal agencies had granted COA news media request status as of April 2012: the Departments of Education, Energy, and Commerce; and the Federal Emergency Management Agency. A181 n.21. FTC should have considered these determinations. See *EPIC*, 241 F. Supp. 2d at 14-15 (admonishing the agency for not explaining or distinguishing why it denied the requestor when other federal agencies gave the requestor news media status).

In sum, the number of pages that FTC found in response to COA's request(s) for the Guides (201 or more pages), together with the seventy-nine pages released in response to items two and three of Request Three, are sufficient to trigger an analysis of COA's fee requests. Additionally, the district court erred in not finding FTC's search for documents inadequate. Therefore, the district court's decision that fees were moot should be reversed.

---

would use editorial skill to turn raw materials into a distinct work. Third, COA demonstrated that it would distribute these reports through the various mechanisms it regularly uses to distribute information, including "through [COA's] regular periodicals . . . 'Agency Check' and 'Cause of Action News.'" COA also detailed it would use its website and social media platforms to disseminate the information. A181.

**IV.     COA Qualified For A Public Interest Fee Waiver For FOIA Requests One, Two, And Three.**

   **A.     Overview Of The Public Interest Fee Waiver Analysis.**

   COA established its right to a fee waiver under FOIA's public

interest provision because it satisfied the two-part statutory test.  That is, COA

demonstrated "that the information sought [was] (1) in the public interest because

it is likely to contribute significantly to public understanding of the operations and

activities of the government and (2) is not primarily in the commercial interest[35] of

the requestor." *Judicial Watch, Inc. v. Gen'l Servs. Admin.*, No. 98-2223, 2000

U.S. Dist. LEXIS 22872, at *10 (D.D.C. Sept. 25, 2000) (citations omitted); *see*

*also Carney*, 19 F.3d at 814  (citing *Nat'l Treasury Emps. Union v. Griffin*, 811

F.2d 644, 648 (D.C. Cir. 1987)).

   **B.     COA Satisfied The Third Element Of The Public Interest Test.**

   The district court erroneously held that COA did not satisfy its burden

regarding the third element of the public interest test because the court

misconstrued the proper legal standard and failed to account for what Judge

---

[35] FTC decided this factor in COA's favor with respect to Request One.  *See* A385 & n.2.  FTC also admits COA was not a commercial requestor when it classified COA as an "Other (General Public)" requestor.  A174.  Further, as a 501(c) educational nonprofit, COA's purpose is to "provide the information to the public," and it therefore had no commercial interest in the request which was seeking information about how FTC enforced its Guides.  A042; *see also* A021; A027. The district also agreed that Request One was not primarily in COA's commercial interest.  A385 & n.2.

Robertson called the technology of the "Information Age." *D.C. Technical Assistance Org. v. Dep't of Hous. & Urban Dev.*, 85 F. Supp. 2d 46, 49 (D.D.C. 2000). Moreover, the district court improperly analyzed the requirement that the information "would increase the understanding of the *public at large*." A389 (citing 16 C.F.R. § 4.8(e)(2)(i)(c)) (emphasis original). These errors are fatal to the district court's opinion.

As courts in this Circuit have concluded, "the information *need not reach a broad cross-section of the population to benefit the 'public at large' for this purpose*." *Judicial Watch*, 2000 U.S. Dist. LEXIS 22872, at *25-26 (citing *Better Gov't Ass'n*, 780 F.2d at 89 (emphasis supplied and other citations omitted). The district court imposed an unreasonably high standard on Cause of Action which is contrary to FOIA. The OPEN Government Act amendments were intended to benefit organizations in the same or similar position as COA by "forbidding the use of fees as 'toll gates' on the public access road to information." *Better Gov't Ass'n*, 780 F.2d at 94 (note omitted).

Additionally, the district court's main finding on the third element of the public interest test centered almost exclusively on the stilted notion that COA did not possess the means to disseminate the information to the public because "it only identified two methods of dissemination," namely, a website and articles published by other news media outlets. A389-92.

53

As a purely factual matter, the district court too narrowly constrained the methods by which COA intended to distribute the requested information because those methods were not limited to its website and articles.  For example, in its April 4, 2012 appeal letter, COA stated that it "uses technology—including but not limited to the Internet, Twitter, and Facebook—to publish and distribute news." A182.  At that time, COA also published an e-mail newsletter, another newsletter titled "Agency Check," and yet another periodical titled "Cause of Action News." *Id.*; *see supra* Section I.

To this end, the district court's statements in its memorandum opinion are inaccurate and incomplete.  After acknowledging a myriad of dissemination methods which embodied the functionality of COA's mission as a months-old start-up nonprofit, the district court erroneously concluded that this was not enough.  But that decision was based in large part upon the court's finding that COA "did not provide most of this evidence during the lengthy administrative process."  A392.  The Record indicates otherwise.  A020-22; A026-27; A029-34; A037-39; A041-43; A045-49; A152-60; A165-73; A176-84.

The district court compounded its error by failing to understand the significance of COA's presence as an alternative media entity with a reasonably broad audience with interest in the subject matter of FTC's enforcement of the

54

Guides. *Judicial Watch*, 2000 U.S. Dist. LEXIS 22872, at *25-26 (citing *Better Gov't Ass'n*, 780 F.2d at 89 (other citations omitted)); *Carney*, 19 F.3d at 815.

The court's dismissive conclusion that COA's website was insufficient because it was merely a passive repository is erroneous, and contrary to common knowledge of the nature of the Internet.

"In this Information Age, technology has made it possible for almost anyone to fulfill this requirement." *D.C. Technical Assistance Org.*, 85 F. Supp. 2d at 49 (cited by *Judicial Watch*, 2000 U.S. Dist. LEXIS 22872, at *31). Possible indeed in the usual case, and certain in this case based upon COA's express documentation of its intent and ability to disseminate the information to a reasonably broad audience with interest in the subject matter.

COA fully satisfied the third element of the public interest fee waiver test, and this Court should so find.

## **CONCLUSION**

For the foregoing reasons, Appellant Cause of Action respectfully requests this Court to reverse the decision of the district court granting FTC's motion for summary judgment.

55

May 6, 2014                              Respectfully submitted,


                                        /s/ Patrick J. Massari
                                        PATRICK J. MASSARI
                                        ALLAN L. BLUTSTEIN
                                        R. JAMES VALVO III
                                        MARIE ALLISON CONNELLY
                                        CAUSE OF ACTION
                                        1919 Pennsylvania Ave., NW, Suite 650
                                        Washington, D.C. 20006
                                        (202) 499-4232

                                        *Counsel for Cause of Action*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I hereby certify that this brief complies with the type-volume limitation in Rule 32(a)(7)(B).  Prepared in Microsoft Word 2010, the foregoing brief used proportionally spaced type in 14-point Times New Roman font.  The brief, excluding the parts exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), contains 13,183 words except for (1) corporate disclosure statement, (2) table of contents, (3) table of authorities, (4) statement with respect to oral argument, (5) any addendum containing statutes, (6) rules or regulations, and (7) any certificates of counsel as counted by Microsoft Word 2010.

Dated: May 6, 2014                    /s/ Patrick J. Massari
                                      *Counsel for Cause of Action*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 6, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system. I also hereby certify that I will have eight copies hand-delivered or sent via Federal Express overnight delivery to the Court within two business days, pursuant to Circuit Rule 31(b).

/s/ Patrick J. Massari
*Counsel for Cause of Action*